FILED

2010 Mar-31  PM 12:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **DAVID WAYNE BREEDLOVE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| **v.** ) | Civil Action Number |
| ) | **2:08-cv-00801-AKK** |
| **ERIC K. SHINSEKI,** ) | |
| **SECRETARY, UNITED** ) | |
| **STATES DEPARTMENT OF** ) | |
| **VETERANS AFFAIRS,** ) | |
| ) | |
| Defendant. | |

## MEMORANDUM OPINION

## I.  PROCEDURAL HISTORY

Plaintiff David Wayne Breedlove ("plaintiff") filed this action against R.
James Nicholson,[1] in his capacity as Secretary of the United States Department of
Veterans Affairs ("defendant"), on May 6, 2008.  Doc. 1.  Plaintiff alleges claims
for disparate treatment, hostile work environment, and constructive discharge
based on race and gender discrimination in violation of 42 U.S.C. § 2000e *et seq.*
Doc. 1.  Defendant moved for summary judgment on all counts.  For the reasons

---

[1]Eric K. Shinseki replaced R. James Nicholson as Secretary of the United States
Department of Veterans Affairs on January 21, 2009 and, consequently, is properly substituted
for Mr. Nicholson.

1

set forth below, the motion is GRANTED.

## II.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is

no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of

proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden

then shifts to the nonmoving party, who is required to "go beyond the pleadings"

to establish that there is a "genuine issue for trial."  *Id*. at 324 (internal citations

and quotations omitted).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court

must construe the evidence and all reasonable inferences arising from it in the

light most favorable to the nonmoving party.  *Adickes v. S. H. Kress & Co.*, 398

U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (1986) (all justifiable

inferences must be drawn in the non-moving party's favor).

## III.   FACTUAL BACKGROUND

The facts summarized below are undisputed except where otherwise indicated.  Plaintiff, who is an African-American male, worked at the Birmingham Veteran's Administration Medical Center ("VA") from June 6, 2006 to February 8, 2007.  Doc. 32-2, Def.'s Ex. 1, 10:20-22; Doc. 33-9, Def.'s Ex. 33.  The VA granted plaintiff, who is a registered nurse ("RN"), an experience waiver and appointed him as a Nurse I, Level 3, even though he lacked the requisite one-to-two years of work experience required.  Doc. 32-5, Def.'s Ex. 4 at 1-3.

During his orientation in the surgical intensive care unit ("SICU"), plaintiff informed his supervisor, SICU Nurse Manager Debbie Litton ("Litton"),[2] of problems with his preceptor and requested a reassignment.  Doc. 32-9, Def.'s Ex. 8.  The parties resolved their issues at a conference.  Doc. 32-10, Def.'s Ex. 9.  Plaintiff later expressed satisfaction with his preceptor, telling Litton that he was "a little harsh and judgmental" when he requested a reassignment.  Doc. 32-11, Def.'s Ex. 10.

---

[2]Litton, as Nurse Manager for SICU, is responsible for education and discipline for nurses in her unit.  By contrast, a Nurse Coordinator supervises all nurses in the hospital.  If an incident happens when a Nurse Manager is off-duty, the Nurse Coordinator provides feedback on the incident to the Nurse Manager.  Doc. 32-20, Def.'s Ex. 19 at 6-7.

*Incident Involving Heparin Medication*

On December 12, 2006, Charge Nurse[3] Deedra Green ("Green") called

Litton at home to inform her of a medication error by plaintiff.  Doc. 32-12, Def.'s

Ex. 11.  Plaintiff infused Heparin at a much higher rate than ordered by the

physician, which required Green to administer an antidote.  *Id*.  The patient's

physician, Dr. Gadjos, insisted on speaking with Litton.  He accused plaintiff of

incompetence, demanded that Litton "get rid of him," and insisted on knowing

what actions Litton planned to take.  *Id*.  Litton told him that she could not take

any action until after a thorough investigation, and informed him that she would

ask the Nursing Coordinator, Jane Moore, to request reports from all nurses on

duty.  *Id*.

Moore spoke with plaintiff, who placed the blame on being very busy that

day with two patients.[4]  Doc. 32-13, Def.'s Ex. 12; Doc. 32-17, Def.'s Ex. 16.

Plaintiff stated also that he had requested that Litton provide him with additional

---

[3]Green testified at her deposition that the Nurse Manager selects the Charge Nurse, which is a supervisory position that rotates among the more experienced nurses.  Doc. 36-2, Pl.'s Ex. 2 at 21:24-24:16.  However, the position did not always necessarily go to the most senior nurse on duty.  *Id.*  The Charge Nurse reported to the Nurse Manager during normal business hours and to the Nurse Coordinator on nights and weekends.  *Id.*

[4]Plaintiff testified that 2:1 is the normal ratio of patients to nurses, but that ratio may be lowered if a patient requires more assistance.  Doc. 32-2, Def.'s Ex. 1 at 20:4-8.

assistance.[5]  *Id*.  Unsure about the doctor's order, he asked Green if he needed a protocol for the Heparin order; she replied that he did not.  Doc. 32-13, Def.'s Ex. 12.  He did not show the doctor's order to Green.  Doc. 32-17, Def.'s Ex. 16.  He then infused the Heparin at 125 cc/hr instead of 10 cc/hr.[6]  Doc. 32-13, Def.'s Ex. 12.

In plaintiff's report of contact on the incident he explained: "In my haste, I had confused 500 units for 500/cc an hour."  Doc. 32-17, Def.'s Ex. 16.  Plaintiff further stated that he "regret[ed] not calling the doctor or pharmacist before administering the drug, although I questioned the order in my mind and verbally to others."  *Id*.

The following day, Litton held a conference with plaintiff to discuss the error.  Doc. 32-15, Def.'s Ex. 14 at 1.  Litton described the error as "very serious" and drew up an "Expectations and Action Plan," which plaintiff signed on December 22, 2006.  *Id*. at 1-2.  The plan required plaintiff to (1) look up a

---

[5]Plaintiff testified that when he requested assistance from Litton earlier in the day, she laughed and said "that ain't going to happen."  He also testified that she said he might get some help later in his shift.  Doc. 32-2, Def.'s Ex. 1 at 21:13-22:8.

[6]The doctor's order states "Heparin/Sodium Chloride INJ, SOLN 25000UNT/500ML IV PRN Please run at flat rate of 500 units/hr."  Doc. 32-16, Def.'s Ex. 15.  Plaintiff questions whether the doctor's order was improperly written because it failed to state also that the medicine should run at 10cc/hr.  *See* Doc. 35 at 10-11.  However, as discussed below, because this disputed fact is not material, the court need not consider whether the doctor properly wrote the order.

medication in a drug guide and ask the Charge Nurse to confirm his understanding any time he was unsure of an infusion rate; (2) call the pharmacy or physician for an infusion rate if one was not stated on the order or medication; (3) receive individual instruction by the critical care educator with respect to Heparin infusions and Alaris infusion pump management; (4) familiarize himself with the Heparin protocol versus flat rate Heparin; (5) familiarize himself with the functionality of the Alaris infusion pump, dosages, infusions, conversions, and the Phillips bedside monitor conversion tables; (6) provide an inservice to the staff detailing what he learned from his study of the Heparin protocol versus flat rate Heparin; (7) draft and provide to the Nurse Manager a list of high risk medications commonly used in the critical care area indicating the name, classification, indications for use, common adverse effects, treatment overdose, and nursing considerations for each medication; and (8) verify the dosage route and infusion rate with a Charge Nurse before administering any of those high risk medications for three months, ending March 30, 2007. *Id.*

*Comparator for Heparin Incident*

On December 24, 2006, a patient went into respiratory arrest after Shaun Tolbert ("Tolbert"), a white male nurse, administered a dose of Levophed via I.V. push.  Doc. 32-20, Def's Ex. 19 at 5.  The Nursing Coordinator who responded to

6

the code situation, Joyce Phillips, originally thought that the physician, not Tolbert, pushed the drug.  *Id*. at 5; Doc. 32-24, Def.'s Ex. 23.  Tolbert did not submit an incident report and Phillips did not direct him to do so.  Doc. 32-20, Def's Ex. 19 at 5-6.

Litton claims that she first learned of the incident on January 22, 2007, when Green brought the event to her attention and informed her that plaintiff thought Litton treated him differently from Tolbert.  Doc. 32-14, Def.'s Ex. 13 at 8-9; Doc. 32-21, Def.'s Ex. 20.  Plaintiff disputes this fact and states that Litton knew or should have known of the incident within a day of two of it occurring.  Plaintiff cites as evidence a declaration from  Zaundra Thornton ("Thornton"), who was a Patient Services Assistant in the SICU at the time of plaintiff's employment, stating "the next day [after Tolbert's error] everyone on the unit, including myself, knew that [] Tolbert had committed this very serious medication error. . . . [T]here were morning staff meetings every morning where such things would be discussed.  Consequently it would be almost impossible for [] Litton not to have known of [] Tolbert's medication error within a day or two of it occurring."  Doc. 38-1, Pl.'s Ex. 5 ¶ 7.[7]

---

[7]Plaintiff also cites to an incident report prepared by the Charge Nurse on duty, Mary Smaniotto, and states that the incident report would have been reported through the chain of command to Litton.  Doc. 35 at 4 (citing Doc. 36-8, Pl.'s Ex. 8).  This court is required to resolve

Plaintiff does not dispute that, after January 22, 2007, Litton required Tolbert and Mary Smaniotto ("Smaniotto"), the Charge Nurse on duty during the incident, to submit reports to her, which they did.  Doc. 32-21, Def.'s Ex. 20;  Doc. 32-22, Def.'s Ex. 21.  Tolbert noted in his report that no incident report was requested or initiated at the time of the incident.  Doc. 32-22, Def's. Ex. 21. Smaniotto's report states that she and Tolbert discussed drafting an incident report but determined that the Nurse Coordinator would tell them if they needed one. Doc. 32-23, Def's. Ex. 22.  Smaniotto's report also explains that Tolbert administered the medication per the doctor's order but that the doctor, who was new in the unit, prescribed an I.V. push rather than a drip.  *Id*.  Litton held a conference with Tolbert on February 14, 2007, told him that his error was serious, and instituted an "Expectations and Action Plan" very similar to the one provided to plaintiff.  Doc. 32-25, Def's. Ex. 24.

*Medication Discrepancies Raised by Pharmacy*

Jane Sims ("Sims"), a pharmacy specialist, periodically runs reports from Pyxis, a medicine dispensing machine, to review the withdrawal of controlled

---

all *justifiable* inferences in plaintiff's favor.  *Anderson*, 477 U.S. at 255.  Plaintiff asks us to infer that the incident report was drafted and forwarded the day of the incident.  However, that inference directly contradicts other evidence in the record.  First, the incident report is dated December 24, 2007, even though the incident occurred on December 24, 2006.  Doc. 36-8, Pl.'s Ex. 8.  More importantly, Smaniotto and Tolbert both stated that, at the time of the incident, they did not draft or submit an incident report.  Doc. 32-23, Def.'s Ex. 22; Doc. 32-22, Def.'s Ex. 21.

substances.  Doc. 33-1, Def.'s Ex. 25 at 31:18-23.  Because plaintiff withdrew controlled substances at a higher rate than the standard or the mean for January 2007, Sims compared each withdrawal to see if plaintiff later scanned the medication as administered to a patient.  *Id*. at 31:18-32:8, 37:2-38:24.  As a result of her review, she found three discrepancies and contacted Litton on January 14, 2007 for clarification.  Doc. 33-3, Def.'s Ex. 27.

Litton and plaintiff resolved two of the three discrepancies, but Litton remained concerned about the third.  The records showed that, on January 1, 2007, plaintiff withdrew two tablets of Alprazolam (Xanax) but administered only one-half of a tablet to his patient.  Doc. 32-19, Def.'s Ex. 18 ¶ 5.  Plaintiff remembered "wasting" (destroying) half a tablet but did not recall anything about the second tablet.  *Id*.  Litton explained how to document waste in the Pyxis machine, asked him to further review the documentation from that day, and requested that he provide a written explanation on the discrepancy.[8]  *Id*.

According to Litton, she then informed him that she would forward his response to the appropriate department for further investigation and told him that other officials may question him.  *Id*.  Plaintiff disputes this fact to the extent it

---

[8]According to plaintiff, at some point during this conversation or a later conversation, Litton told him that the DEA "would be knocking on [his] door" if he could not account for the missing tablet.  Doc. 32-2, Def.'s Ex. 1 at 36:6-12.

implies that he did not respond in the time frame requested.  According to plaintiff, Litton directed him to respond to her in writing by January 19, 2007.[9] Doc. 36-1, Pl.'s Ex. 1 at 89:14-17.  In a letter dated January 17, 2007, which is marked "Rec'd 1/19/07 DL," plaintiff stated that he did not remember withdrawing two Alprazolam tablets and that it was difficult for him "to recall exactly what happened 367 hours" after the incident.  Doc. 33-4, Def.'s Ex. 28. He further stated that he did not have the policy on wasting drugs nearby on the date the incident occurred, but that he asked someone to witness him discarding half a tablet.  *Id*.  Plaintiff concluded his letter by stating that he was "not a drug addict or a thief, and [that he took] offense at any suggestion of that being the case."  *Id*.

On January 18, 2007, Litton notified Sims that she had not received plaintiff's report and had no further explanation with respect to the missing Alprazolam.  Doc. 36-1, Pl.'s Ex. 1 at 91: 8-21.  Sims then contacted the VA police.  *Id*. at 91: 19-21; Doc. 36-9, Pl.'s Ex. 9.  Litton testified that she believed that plaintiff wasted the half of a tablet as he said, but that she did not know how

---

[9]Litton's deposition testimony indicates that there was confusion over the date.  She requested a response by "Thursday, January the 19th, 2007" but Thursday was actually January 18th, not 19th.  Doc. 36-1, Pl.'s Ex. 1 at 90:6-18; Doc. 36-10, Pl.'s Ex. 10.  For the purpose of this motion, the court will assume that plaintiff responded in the time frame requested.

to account for the other missing tablet.  *Id*. at 104:1-20.

Both parties agree that Litton followed the VA's operating procedures governing controlled substance balance count discrepancies, which require the nurse manager to (1) try resolve the discrepancy by printing an activity log for the drug for the past twenty-four hours, (2) seek assistance from the Pharmacy, and (3) "promptly call" the VA Police Service.  Doc. 33-5, Def.'s Ex. 29 at 15.

According to Litton, she did not propose or enact a written admonishment, written reprimand, suspension, or termination against plaintiff with respect to the discrepancy.  Doc. 32-19; Def.'s Ex. 18 ¶ 6.  Plaintiff disputes this fact.  Doc. 35 at 6.  Plaintiff, however, points to no evidence indicating that Litton in fact took one of these actions; rather, he appears to characterize her decision to inform Sims that plaintiff failed to provide an explanation for the missing Xanax as a disciplinary act.  *Id*.

*Comparator for Medication Discrepancies: Alice Oswalt*

On December 6, 2006, Floyd Walfield, the Assistant Chief of Police, emailed Litton requesting information on a medication discrepancy by Alice Oswalt ("Oswalt"), a white female RN.  Doc. 33-6, Def.'s Ex. 30 at 2-3.  Litton responded initially that she still needed to obtain the patient's medical records.  *Id*. at 2.  After obtaining the records, Litton further responded that, from October 13

11

to 16, 2006, Oswalt withdrew thirteen doses of morphine that were not scanned as given to the patient.  *Id*. at 1.  Eight of the thirteen doses were handwritten on the patient's medical records as given.  *Id*.  As for the other five doses, which Oswalt did not document or scan, the records indicated to Litton that Oswalt administered them in the time period during the "very chaotic" immediate return from surgery when nurses often do not scan medications.  *Id*. Litton further stated that she discussed the importance of scanning medication with Oswalt.  *Id*.

Sims, who initiated the investigation by contacting Walfield and Litton, responded to Litton that she was satisfied with the explanation but requested a report of contact from Oswalt on the incident.  *Id*.  Sims further noted that "[t]he narcotic inspection team leaves no wiggle room regarding doses not scanned. Neither does Joint Commission or the office of the Inspector General . . . . [N]urses are expected to document, somehow, every dose withdrawn from the pyxis."  *Id*.

Oswalt's report of contact states that she omitted the doses of morphine from her documentation due to handling multiple tasks while her patient was unstable.  Doc. 33-7, Def.'s Ex. 31.  She acknowledged that she needed to improve her documentation practices and attached a revised copy of the patient's medical records.  *Id*.

*Plaintiff's Contact Isolation Breach Incident*

On January 8, 2007, a physician informed Litton that he had just witnessed a nurse entering the room of patient room under strict contact isolation without first donning a gown and gloves.  Doc. 33-8, Def.'s Ex. 32.  The nurse also did not wash his hands upon exiting the room.  *Id*. Litton told the doctor that she would investigate the incident.  *Id*.

Litton approached the nurse's station and asked the nurses who had entered the room.  *Id*.  Plaintiff admitted entering the room without gown and gloves to check on an alarm on the patient's I.V. pump, but stated that he was only in the room for a few minutes.[10]  *Id*.  Litton told him that the VA required him to follow the strict contact isolation precautions no matter how long he was in the room.  *Id*.

Another RN at the nurse's station, Krystal Sears-Truss ("Sears-Truss"),[11] responded that doctors frequently entered isolation rooms without following precautions.  *Id*.  Litton replied that nurses are required to follow the precautions whether physicians do or not.  *Id*.

According to plaintiff, Litton spoke in a loud, condescending, and non-

---

[10]Plaintiff admitted this fact in his response to the motion for summary judgment.  Doc. 35 at 7.  However, he also stated that he did not notice the contact isolation notice when he entered the room as the door to the room was open, obscuring the sign.  Doc. 35 at 14; Doc. 32-2, Def.'s Ex. 1 at 54: 2-5.

[11]Ms. Sears-Truss is also African-American.

professional manner during this incident.  Doc. 32-2, Def.'s Ex. 1 at 55:21-25.

*Contact Isolation Protocol Comparators*

Plaintiff claims that he kept a log for the rest of the day of people that entered the room without following the isolation protocol.  *Id*. at 54:14-17. Plaintiff testified that he was not sure, but thought he gave Litton a copy of the list.  *Id*. at 54:19-23.  Litton denied receiving it.  Doc. 36-1, Pl.'s Ex. 1 at 44:21-46:7.

Plaintiff also submitted evidence from Sears-Truss, who affirmed her familiarity with the VA's contact isolation protocols and stated that "many white nurses and physicians have violated these protocols with no admonishments or warnings from Litton, who was aware of the violation."  Doc. 36-4, Pl.'s Ex. 4 ¶ 9.

*Formal Discipline at the VA*

The VA has a progressive disciplinary policy that includes the following actions, in order of severity: written admonishment, written reprimand, suspension, and termination.  Doc. 32-18, Def.'s Ex. 17 ¶ 2.  The VA retains hard copy disciplinary files and a database that shows all disciplinary actions either proposed or actually taken against VA employees since 2004.  *Id*. at ¶ 1.  Oral and written counselings are not considered disciplinary actions and are not included in an employee's personnel files or the discipline database.  *Id*. at ¶ 3.

Litton claims that she never proposed or enacted a written admonishment, written reprimand, suspension, or termination against plaintiff.  Doc. 32-19, Def.'s Ex. 18 ¶ 2.  According to the VA's custodian of disciplinary records, no record of a proposed or enacted disciplinary action against plaintiff appears in any of the VA's files.  *Id*. at ¶ 3.

Plaintiff disputes the contention that Litton never took any disciplinary action against him, (doc. 35 at 3), but does not argue that the VA's files contain any disciplinary records against him.  Rather, he characterizes the above incidents as discipline.

*Other Hostile Work Environment Claims*

Plaintiff claims that a managerial employee speaking at one of his orientation classes stated that the VA was actively recruiting white females so that the staff would better resemble the racial makeup of Birmingham.  Doc. 32-2, Def.'s Ex. 1 at 58:5-61:5.  Plaintiff cannot identify who made the statement and never discussed it with anyone at the hospital.    *Id*. at 58:15-18, 60:18-61:5. Timothy Fleming, another RN who attended the same training, also recalled the comment but could not identify the speaker.  Doc. 38-2; Pl.'s Ex. 6 ¶ 3.

Plaintiff alleges that, during his orientation, a Charge Nurse, Joy Davenport, told him that he would be "better off going to get coffee instead of trying to be a

15

nurse." Doc. 32-2, Def.'s Ex. 1 at 61:9-25.  He did not report this comment to Litton because he previously requested a new preceptor during his training without result.  *Id*. at 62:9-63:21.

Plaintiff alleges that, while cleaning a patient, Oswalt commented that "they" thought he was "going to be like Sabon," referring to an African-American former male nurse  who was rumored not to clean his patients.  *Id*. at 68:21-69:16.

Plaintiff alleges that Litton never asked him to be a Charge Nurse.[12]  *Id*. at 80:4-10.  Plaintiff admits that he never requested a Charge Nurse rotation.[13]  *Id*. at 80:11-17.   Plaintiff submitted a declaration from Thornton, stating that Litton permitted Tolbert to serve as a Charge Nurse "while Mr. Breedlove was never allowed to act as a Charge Nurse, even though he was more experienced than Mr. Tolbert."  Doc. 38-1, Def.'s Ex. 5 ¶ 6.  Plaintiff also submitted a declaration from Sears-Truss, stating that she tried to refuse the assignment of Charge Nurse, "but on several occasions was bullied into assuming the position" and that Litton would support the decisions and actions of white nurses acting as Charge Nurse, but not those of black nurses.  Doc. 36-4, Pl.'s Ex. 4 ¶ 5.

---

[12]Plaintiff admits that he is not raising the failure to appoint him as Charge Nurse as a separate claim, but rather only as evidence of a hostile work environment.  Doc. 35 at 32.

[13]Plaintiff testified in his deposition that people are appointed to Charge Nurse duty.  Doc. 32-2, Def.'s Ex. 1 at 80:11-20.

Plaintiff also alleges that Litton discriminated against black nurses, particularly males, in the following ways: (1) using rude, degrading, and demeaning speech and conduct, (doc. 36-4, Pl.'s Ex. 4 ¶ 6); (2) permitting white nurses more flexible scheduling and excused tardiness, (doc. 38-1, Pl.'s Ex. 5 ¶ 4); and (3) admonishing Sears-Truss for reporting a doctor's mistake by saying that her "interpersonal skills were lacking" when white nurses did not receive the same comment (doc. 36-4, Def.'s Ex. 4 ¶ 4).

*Resignation and EEOC Claim*

Plaintiff resigned effective February 8, 2007.  Doc. 33-9, Def.'s Ex. 33.  On January 25, 2007, he contacted an Equal Employment Opportunity counselor and filed a complaint on February 26, 2007.  Doc. 33-10, Def.'s Ex. 34.

Around January 2007, plaintiff developed hypertension and received medication for the same.  Doc. 32-2, Def.'s Ex. 1 at 81:15, 91:13-25.  He also sought counseling from the Employee Assistance Program, where one counselor recommended that he return to Memphis.  *Id*. at 81:17-21.

## IV.  ANALYSIS

### A.    *Plaintiff fails to state a prima facie case of race or gender discrimination*.

"To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) [he] is a member of a

protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted). "If the plaintiff satisfies these elements, then the defendant must show a legitimate, non-discriminatory reason for its employment action." *Id*. (citation omitted). "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id*. (citation omitted). In this case, there is no question that plaintiff meets the first and four elements; the parties dispute only whether plaintiff meets the second and third elements.

1. *Plaintiff did not experience an adverse employment action.*

An adverse employment action is "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Davis v. U.S. Postmaster Gen.*, 190 Fed. Appx. 874, 876 (11th Cir. 2006) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)). "The employee's subjective perception of the seriousness of the change is not

controlling; rather this issue is viewed objectively from the perspective of a

reasonable person in the circumstances." *Grimsley v. Marshalls of MA, Inc.*, 284

Fed. Appx. 604, 608 (11th Cir. 2008).

Plaintiff argues that Litton's actions altered the terms, conditions, and

privileges of his employment.  Doc. 35 at 19. The Eleventh Circuit cautions that

"not all conduct by an employer negatively affecting an employee constitutes

adverse employment action" and that Title VII is not a "general civility code."

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238-39 (11th Cir. 2001)

(citations and internal quotation marks omitted).  Specifically, "in the vast

majority of cases, a temporary change in work assignments that creates no tangible

harm, and does not alter the employee's permanent job title, is not adverse."

*Davis v. U.S. Postmaster Gen.*, 190 Fed. Appx. at 876 (citing *Town of Lake Park*,

245 F.3d at 1245).

In *Davis v. U.S. Postmaster General*, the Eleventh Circuit determined that

the plaintiff failed to establish that several acts, either collectively or individually,

constituted an adverse employment act.  190 Fed. Appx. at 875-76.  The plaintiff

alleged that his employer reassigned him to different machines, assigned him to

work alone, prevented him from talking to co-workers, did not allow him to work

with other African-Americans, did not provide requested assistance, monitored his

work and his movements excessively, paged him throughout the work day, gave

him difficult assignments, gave him a "biased warning" after he worked through a

break, frequently changed his job responsibilities, and talked down to him in a

demeaning manner. *Id*. at 875.  The court concluded that the incidents primarily

concerned the plaintiff's work assignments and supervision and did not affect the

terms, conditions, or privileges of his employment. *Id*. at 876.  *See also Grimsley*,

284 Fed. Appx. at 609 (no adverse employment action when employer increased

plaintiff's workload, denied him breaks given to other supervisors, and forced him

to perform manual labor tasks outside his job description).  *But see Shannon v.

BellSouth Telecomms., Inc.*, 292 F.3d 712, 714, 716 (11th Cir. 2002) (denial of

overtime opportunities resulting in loss of at least $13,000 constituted material

adverse employment action).

Moreover, where criticism or a negative employment review, even if

allegedly unfounded, is not accompanied by a tangible impact on the terms,

conditions, and privileges of employment, such criticism is insufficient to form the

basis of a Title VII claim. *Town of Lake Park*, 245 F.3d at 1242.  In *Town of Lake

Park*, the plaintiff, a police officer, alleged an adverse employment action based

on two job performance memoranda, one of which stayed in his files until after

litigation began, and two occasions on which he was not designated the "officer in

20

charge" (the person who fills in when a supervisor is out of the office). 245 F.3d at

1240.  In finding that these events, either individually or collectively, did not

constitute an adverse employment action, the Eleventh Circuit noted that the

department considered the job performance memoranda to be counseling

memoranda rather than formal reprimands under the department's progressive

discipline policy.  *Id.*  Moreover, the plaintiff did not suffer any loss of pay or

benefits from the negative memoranda.  *Id*. The court found plaintiff's argument –

that the memoranda were unwarranted, diminished his prestige and self-esteem,

and could negatively impact future job prospects – insufficient.  *Id*.  According to

the court:

> Employer criticism, like employer praise, is an ordinary and
> appropriate feature of the workplace. . . .  Federal courts ought not to
> be put in the position of monitoring and second-guessing the
> feedback that an employer gives, and should be encouraged to give,
> an employee.  Simply put, the loss of prestige or self-esteem felt by an
> employee who receives what he believes to be an unwarranted job
> criticism or performance review will rarely – without more – establish
> the adverse action necessary to pursue a claim under Title VII's anti-
> discrimination clause.

*Id*. at 1242.  Similarly, the court found that the decision not to designate the

plaintiff as the "officer-in-charge" on two occasions was not a substantial or

material alteration in the plaintiff's work responsibilities.  *Id*. at 1243-44.  The

court concluded that few, if any, responsibilities accompanied the designation, the

21

designation was temporary by its very nature, and the plaintiff's removal as "officer-in-charge" did not deprive him of valuable or necessary experience. *Id.* 1244-45.

Here, plaintiff bases his disparate treatment claim on actions taken by Litton after three specific incidents. Specifically, he claims that: (1) after the Heparin incident, Litton placed him on an action plan that reduced his independence in administering medication and required him to take a number of steps to educate himself about certain high-risk medications; (2) when he could not explain the discrepancy between the Pyxis report and the medication he administered to a patient, Litton threatened law enforcement involvement and notified Sims when he failed to provide a written response by the date she expected it; and (3) after he entered an isolation contact room without proper attire, she publicly criticized him.

Although plaintiff disputes whether Litton's criticisms and actions were warranted or fair, he failed to present any evidence that (1) he was formally disciplined, or (2) Litton's actions had a tangible impact on the terms, conditions, and privileges of his employment. *Town of Lake Park*, 245 F.3d at 1242. As in *Town of Lake Park*, defendant presents evidence that neither Litton nor any other person ever undertook a *formal* disciplinary action under the VA's progressive disciplinary policy against plaintiff and no disciplinary record appears in his file.

22

Doc. 32-19, Def.'s Ex. 18 ¶ 2; Doc. 32-18, Def.'s Ex. 17 ¶ 3.  Although plaintiff

disputes the *conclusion* that he was not disciplined, he acknowledges that his

personnel file is void of any disciplinary write-up.  Significantly, he does not

present any evidence that he received a formal admonishment or more serious

disciplinary action.

 This court finds that the Expectations and Action Plan drawn up after the

Heparin incident is akin to the counseling memoranda discussed in *Town of Lake*

*Park*.  245 F.3d at 1240.  *See also Dixon v. Palm Beach County Parks &*

*Recreation Dep't*, 343 Fed. Appx. 500, 502 (11th Cir. 2009) (per curiam) (written

record of counseling did not constitute adverse employment action); *Oliver v.*

*Nat'l Beef Packing Co., LLC*, 294 Fed. Appx. 455, 457 (11th Cir. 2008) (per

curiam) (written job performance counseling document likely did not constitute an

adverse employment action).  Although the action plan limited plaintiff's

previously unfettered ability to administer high-risk medications and required

plaintiff to take proactive educational steps – all designed to protect patients from

another overdose by plaintiff, increased supervision and assignment of difficult or

additional tasks do not constitute an adverse employment action.  *Davis v. U.S.*

*Postmaster Gen.*, 190 Fed. Appx. at 876.

 Further, Litton's oral rebuke after plaintiff entered the isolation contact

room without proper attire does not appear on the VA's disciplinary continuum. Rather, it is similar to the "biased warning" and demeaning speech alleged in *Davis v. U.S. Postmaster General*, which failed to rise to an adverse employment action. 190 Fed. Appx. at 875.

Litton's response to Sims that plaintiff could not explain the missing medication, which resulted in Sims' report to the VA police, was arguably the most serious of the actions taken against plaintiff.  Nevertheless, plaintiff has presented no evidence that the police even contacted him after Sims filed the report on January 18, 2007, either before or after he left the VA on February 8, 2007.  Nor has plaintiff presented any evidence that this report had any other effect on his job responsibilities, resulted in any formal disciplinary action, or was placed in his personnel file.  Moreover, plaintiff admits that Litton and Sims followed VA protocol when investigating and reporting the medication discrepancy.  Doc. 35 at 6 (admitting ¶ 61 of defendant's statement of facts).

Aside from the very limited changes in plaintiff's work responsibilities under the action plan, plaintiff's primary complaint is that Litton unfairly singled him out for criticism on three occasions.  Even assuming that he was not at fault for some or all of the incidents, he cannot point to *any* substantial effects on the terms and conditions of his work, such as denial of overtime opportunities,

suspension or termination, or significant changes in his work responsibilities.

Plaintiff calls these incidents "humiliating" and "degrading," (doc. 35 at 20), but

blows to one's self-esteem or prestige, without more, are rarely enough to

constitute an adverse employment action in this Circuit. *See Town of Lake Park*,

245 F.3d at 1240.  There is no doubt that Litton might have approached plaintiff

with more sensitivity on some occasions, but, unfortunately for plaintiff, Title VII

is not a "general civility code." *Id.* at 1239 (citations omitted).  The incidents

identified by plaintiff, individually or collectively, do not rise to the level of an

adverse employment action.

2.      *Plaintiff fails to establish that his employer treated similarly situated*
        *comparators differently.*

        Even assuming that plaintiff sufficiently alleges an adverse employment

action, he fails to establish that his employer treated similarly situated employees

outside of his protected class differently.  "A 'comparator' is an employee outside

of the plaintiff's protected class who is similarly situated to the plaintiff 'in all

relevant respects.'" *Coar v. Pemco Aeroplex, Inc.*, No. 09-12615, 2010 WL

653298, at *2 (11th Cir. Feb. 25, 2010) (citing *Wilson v. B/E Aerospace, Inc.*, 376

F.3d 1079, 1091 (11th Cir. 2004)).  Requiring a similarly situated comparator

prevents "courts from second-guessing employers' reasonable decisions and

confusing apples with oranges." *Burke-Fowler*, 447 F.3d at 1323 (citation and

internal quotations marks omitted).

*Heparin Incident*

Plaintiff alleges that Tolbert is an appropriate comparator for the Herapin

error.  Doc. 35 at 20.  Resolving all reasonable inferences in plaintiff's favor, both

he and Tolbert made medication errors, which may have been attributable in whole

or in part to poorly written orders from doctors.  It is undisputed that Litton

learned of plaintiff's error almost immediately when the patient's doctor called her

at home and demanded that she discharge plaintiff.  The doctor made this call right

after plaintiff's conduct necessitated the need to administer an antidote to the

patient.  Doc. 32-12, Def.'s Ex. 11.  In contrast, no physician called Litton about

Tolbert's incident.  Although plaintiff presents no direct evidence that anyone

informed Litton immediately or soon after Tolbert's error, he presents evidence

that it is likely that she would have learned of the incident before January 22,

2007.  Yet even assuming, as plaintiff suggests, that she delayed her investigation,

the record is clear that she required both Tolbert and plaintiff to write a report of

contact, she had a conference with both to discuss the seriousness of the error, and

instituted a nearly identical action plan for each of them.  Significantly, she did so

even though the investigation revealed that, unlike plaintiff, Tolbert *actually*

followed the doctor's orders to "push" the I.V., rather than administer it as a drip.

Doc. 32-23, Def.'s Ex. 22.  Thus, there is no material difference in her treatment of

the two incidents even though plaintiff's action's – disregarding or administering a

doctor's order he did not understand – were actually more severe than Tolbert's.

*Medication Discrepancies*

Plaintiff states that Oswalt is an appropriate comparator because Oswalt also

retrieved controlled substances from the Pyxis without scanning those

medications.  Doc. 35 at 21.  Plaintiff states that "no law enforcement or VA

police involvement was threatened or taken" in Oswalt's case.  Doc. 35 at 21.

First, this is untrue.  As defendant's undisputed evidence demonstrates, the

pharmacy contacted the VA Police about Oswalt's discrepancies *before* Litton

began her investigation.  Doc. 33-6, Def.'s Ex. 30 at 2-3. Litton did not need to

"threaten" a police investigation – one was already underway.  Second, and

equally significant, Oswalt provided an explanation for the missing medication.

Specifically, she stated that she had administered it to the patient immediately after

surgery.  Furthermore, Litton determined that Oswalt's explanation was consistent

with the medical charts.[14]  Plaintiff, on the other hand,  neither provided an

---

[14]Plaintiff also points to three additional medication discrepancies attributed to Oswalt in
July, 2007.  In each case, she informed Litton that she pulled the medication from Pyxis but, in
her haste, forgot to scan it.  Doc. 36-1, Pl.'s Ex. 1 at 118:19-123:23.  In none of those incidents

explanation nor even attempted to explain why his discrepancy occurred – instead plaintiff responded flippantly that it was difficult for him "to recall exactly what happened 367 hours" after the incident and then, showing disdain for Litton's efforts to follow protocol on controlled substances, stated that he was "not a drug addict or a thief, and [that he took] offense at any suggestion of that being the case."  Doc. 33-4, Def.'s Ex. 28.[15]  The VA, like all health providers, must follow strict protocols when dealing with controlled substances.  The investigation it conducted on plaintiff was warranted.  Significantly, it treated plaintiff no differently than other employees who committed similar infractions.

*Contact Isolation Protocol Incident*

Plaintiff claims that he produced a log to Litton of other individuals who breached the contact isolation controls.  Doc. 35 at 21.  However, plaintiff did not submit this log as evidence.  Nor has he identified the race or rank of the individuals on the log (for example, they may have been doctors, who are not

---

did Oswalt state that she simply could not recall whether she retrieved or administered the medication.

[15]Plaintiff posits another comparator for this issue, which also suffers from a critical flaw. On December 4, 2006, a nurse retrieved two milligrams of morphine from Pyxis that were not scanned as administered or wasted.  However, upon investigation, Litton determined that the "RN that inadvertently scanned a 2mg instead of a 4 mg vial is no longer employed at the BVAMC.  No corrective action possible."  Doc. 36-13, Pl.'s Ex. 13.  Thus, this comparison is inapposite because Litton determined the source of the error – scanning the wrong vial. Moreover, as Litton stated, she could not take corrective action given that the individual responsible was not longer employed.

under Litton's supervision).  *See, e.g. Beamon v. Marshall & Isley Trust Co.*, 411

F.3d 854, 861-63 (7th Cir. 2005) (rejecting vague and conclusory allegations as

insufficient to establish similarly situated prong).  Moreover, he presented no

evidence that a doctor informed Litton of these alleged breaches – as was the case

for plaintiff – and demanded that Litton take action.  Plaintiff thus fails to show

that these individuals are similarly situated in all respects.  *See Wilson*, 376 F.3d

at 1091 (plaintiff must demonstrate that comparators are similarly situated in all

relevant respects).  Accordingly, his reliance on them is misplaced.

## B.     *Hostile Work Environment Claim*

To establish a *prima facie* case for a hostile work environment claim, "a

plaintiff must demonstrate that (1) he belongs to a protected group; (2) he has been

subjected to unwelcome harassment; (3) the harassment was based on a protected

characteristic; (4) the harassment was sufficiently severe or pervasive to alter the

terms and conditions of employment and create a discriminatorily abusive working

environment; and (5) the employer is responsible for that environment." *Davis v.

U.S. Postmaster Gen.*, 190 Fed. Appx. at 877 (citing *Miller v. Kenworth of

Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).  "A hostile work

environment claim under Title VII is established upon proof that 'the workplace is

permeated with discriminatory intimidation, ridicule, and insult . . . .'" *Miller*, 277

29

F.3d at 1275 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Conclusory allegations and assertions are insufficient; the employee must present

"concrete evidence in the form of specific facts."  *Davis v. U.S. Postmaster Gen.*,

190 Fed. Appx. at 877 (citation and internal quotation marks omitted)).  Because

the actions plaintiff experienced were not "sufficiently severe or pervasive to alter

the terms and conditions of his employment," summary judgment in favor of

defendant is also appropriate on this claim.

Courts in the Eleventh Circuit look to four factors when evaluating the

severity of alleged harassment: "(1) the frequency of the conduct; (2) the severity

of the conduct; (3) whether the conduct is physically threatening or humiliating, or

a mere offensive utterance; and (4) whether the conduct unreasonably interferes

with the employee's job performance."  *Miller*, 277 F.3d at 1276.

Here, plaintiff fails to establish that the conduct he experienced is severe

enough to rise to the level of a hostile work environment.  Specifically, he alleges

that: (1) Litton unfairly criticized him on three occasions for work-related errors,

(2) a managerial employee stated that the VA was actively recruiting white female

nurses, (3) a nurse told him he would be better off getting coffee than trying to be

a nurse, (4) another nurse said that "they" thought he was going to be like another

black male nurse, who had a poor reputation, (5) Litton did not select plaintiff to

act as Charge Nurse, and (6) white nurses were permitted more flexibility in scheduling than black nurses.[16]

This conduct, however, falls below the threshold established for hostile environment claims in this Circuit. *Compare Miller*, 277 F.3d at 1276-77 (plaintiff established jury question on severity of harassment when co-workers, with supervisor's awareness, directed ethnic slurs at plaintiff three to four times a day for four months, often in an angry or intimidating manner) *with Hill v. Emory Univ.*, 346 Fed. Appx. 390, 395 (11th Cir. 2009) (summary judgment against plaintiff on hostile work environment appropriate when plaintiff alleged (1) referral to counseling session for his workgroup based on poor morale, (2) demotion in job title, (3) denial of office space and requests for support staff, (4) denial of hiring decision, (5) denial of request to attend educational conference, (6) failure to assign him any direct reports, (7) failure to award pay raises comparable to other employees, and (8) termination); *Alexander v. Opelika City Bd. of Educ.*, No. 06-0498, 2008 WL 401353, at *4-5 (M.D. Ala. Feb. 12, 2008) (no hostile work environment when black employees were allegedly given more

---

[16]Plaintiff also relies on evidence that Litton (1) forced Sears-Truss, a black female nurse to work as Charge Nurse when she did not want to and felt that she did not get the same support from Litton as white nurses, and (2) told Sears-Truss that she should work on her interpersonal skills when Sears-Truss reported a doctor's error.

work than white employees and supervisor and co-workers called plaintiff "boy" eight to eleven times during the two years of his employment, noting that none of the allegedly racist comments contained threats of physical violence); *Mack-Muhammad v. Cagle's Inc.*, No. 08-11, 2010 WL 55912, at *5 (M.D. Ga. Jan. 4, 2010) (no hostile work environment when supervisors often referred to plaintiff as "Mr. Bin Laden," "Osama," and "the Muhammad Man" over company radio and intercom, failed to provide lunches with pork alternatives, and made comments about plaintiff's religious dietary restrictions).

With respect to the three allegedly racist comments uttered in plaintiff's presence, two did not overtly mention race at all, none of the comments included a physical threat, and the comments occurred over a period of eight months. Although thoughtless, rude, or insensitive, the comments do not rise to the level of the daily slurs in *Miller*, or even the repeated derogatory comments in *Alexander* or *Mack-Muhammad*.  And the other allegations – such as Litton's failure to select plaintiff as a Charge Nurse, providing black employees with less flexible scheduling, providing less support to black Charge Nurses, and commenting about a black female nurse's interpersonal skills[17] – are neither as objectively pervasive

---

[17]The court notes that Sears-Truss' allegations that Litton forced her to serve as a Charge Nurse contradicts evidence that Litton did not select African-American employees for this position.  The court further notes that plaintiff has not offered any evidence that he was

or severe as the numerous obstacles the plaintiff in *Hill* experienced.  On this record, plaintiff fails to demonstrate that his workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Miller*, 277 F.3d at 1275 (citation and quotation marks omitted).  Accordingly, the hostile environment claim fails as a matter of law.

**C.     *Constructive Discharge***

"To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person . . . would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (citing *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).  *See also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (noting that the standard is objective, not subjective).  Furthermore, "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment."  *Hipp*, 252 F.3d at 1231.  As with a hostile work environment claim, conduct must be "pervasive" to support a constructive discharge claim.  *Id*.

---

specifically denied flexible scheduling or that he overheard Litton's remarks to Sears-Truss regarding her interpersonal skills.  *See Abbes v. Embraer Servs., Inc.*, 195 Fed. Appx. 898, 902 (11th Cir. 2006) (noting that, since plaintiff did not hear discriminatory statements made by one employee towards another of Lebanese origin, he could not subjectively perceive those statements as hostile).

In *Poole*, the Eleventh Circuit found a genuine issue of material fact existed as to whether the employer constructively discharged the plaintiff when the employer stripped her of all job responsibilities, gave her only a chair and no desk, and isolated her from her colleagues.  *Id*. 129 F.3d 551.  *See also Akins v. Fulton County, Ga.*, 420 F.3d 1293 (11th Cir. 2005) (plaintiffs sufficiently alleged constructive discharge claim when their employer (1) removed almost all of their work duties, (2) excluded them from meetings, (3) instructed other employees not to speak with them, (4) required only them to display their time sheets publicly, and (5) accused them of engaging in illegal behavior to sabotage bids)).  *But see Hipp*, 252 F.3d at 1233-45 (no constructive discharge of three employees when (1) manager publicly berated one employee on two occasions, (2) employees were told or encouraged not to hire new employees who were over fifty-five, (3) employees received memoranda criticizing their performance, (4) new policies made sales more difficult, (5) employer cut expenses for lawn care, secretaries, and office remodeling, (6) employer  remarked that older workers were resistant to change, and (7) employer commented on employee's weight)); s*ee also Beltrami v. Special Counsel, Inc.*, 170 Fed. Appx. 61 (11th Cir. 2006) (per curiam) (no constructive discharge when employee was given list of difficult work objectives to accomplish in thirty days).

Plaintiff's constructive discharge claim, like his hostile work environment claim, must fail because he has not presented evidence of "pervasive conduct." Unlike the plaintiffs in *Poole* and *Hipp* whose employers intentionally isolated them from all colleagues and stripped them of almost *all* work responsibilities, plaintiff alleges only minor changes in his work responsibilities, three incidents of criticism he found unwarranted or unduly harsh, three potentially racially charged comments, and his employer's failure to request that he serve as a Charge Nurse. From an objective standpoint, these incidents are not so intolerable that a person would be forced to resign. *Poole*, 129 F.3d at 553 (citation and internal quotations omitted).

## V.   Conclusion

For the reasons stated above, this court determines that defendant is entitled to summary judgment on all claims. This case is therefore dismissed with prejudice.

DONE this 31st day of March, 2010.


**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE